[Cite as *State v. Smith*, 2014-Ohio-5267.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
### MONTGOMERY   COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 26079 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 2013-CR-3038 |
| v. | : | |
| | : | |
| TRAVIS SMITH | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

## O P I N I O N

Rendered on the 26th day of November, 2014.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by KIRSTEN A. BRANDT, Atty. Reg. #0070162, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45402
    Attorney for Plaintiff-Appellee

CHRISTOPHER W. THOMPSON, Atty. Reg. #0055379, 130 West Second Street, Suite 1444, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

HALL, J.

{¶ 1}   Travis S. Smith appeals from his conviction and sentence on three counts of rape of a child under age ten and one count of importuning.

{¶ 2}   In his sole assignment of error, Smith contends the convictions are against the manifest weight of the evidence.

{¶ 3}   The record reflects that Smith was convicted based primarily on the testimony of the victim, who had turned eleven years old shortly before trial. She testified that on three occasions Smith, her mother's former boyfriend, had engaged in vaginal intercourse with her. She also testified that on one occasion he had asked her to perform oral sex on him. According to the victim, these incidents occurred at three different residences (hereinafter, Residence 1, 2, and 3) her mother had shared with Smith when the victim was between the ages of six and nine.

{¶ 4}   In addition to the victim's testimony, the State presented testimony from the victim's mother, a police officer, a child psychologist, and a medical doctor. None of these witnesses had any direct knowledge about the alleged sexual abuse. The victim's mother testified about the circumstances surrounding her daughter's disclosure of the allegations. The police officer merely testified about completing a report concerning the allegations. The child psychologist, who did not interview the victim, testified generally about the dynamics of child sexual abuse and delayed disclosure. Finally, the medical doctor testified about her examination of the victim following the allegations. The results of the examination were normal, and the doctor neither could confirm nor rule out the occurrence of prior penile-vaginal penetration.

{¶ 5}  For his part, Smith testified in his own defense and denied the victim's allegations. He also presented testimony from a children-services caseworker and a police detective. The caseworker testified that she interviewed the victim after the allegations. According to the caseworker, the victim stated that the sexual abuse had occurred two or three times at one residence and three or four times at another one. Smith used this testimony to impeach the victim's trial testimony that only one sex act had occurred at each of the three residences. Finally, the detective testified about interviewing Smith, who she described as cooperative, and obtaining a DNA sample from him. The detective explained that the DNA sample proved unhelpful because police never obtained any other physical evidence with which to compare it.

{¶ 6}  After hearing the evidence, a jury convicted Smith on all four counts. The trial court imposed an aggregate sentence of thirty years to life in prison and designated him a Tier III sex offender. This appeal followed.

{¶ 7}  As set forth above, Smith contends his convictions are against the manifest weight of the evidence. The essence of his argument is that the victim's testimony lacked credibility. Specifically, he claims her testimony was "formulaic," lacked detail, contained inconsistencies, and at times was incredible.

{¶ 8}  When a conviction is challenged as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380,

387, 678 N.E.2d 541 (1997). In a manifest-weight analysis, the credibility of the witnesses and the weight to be given to their testimony are primarily for the trier of facts to resolve. *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witnesses." *State v. Lawson,* 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). This court will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way. *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510 (Oct. 24, 1997).

{¶ 9} With the foregoing standards in mind, we do not find Smith's convictions to be against the weight of the evidence. In reaching this conclusion, we believe it is appropriate to defer to the jury's assessment of the victim's credibility.

{¶ 10} The victim testified at trial that the first incident of rape occurred at her apartment, "Residence 1." (Tr. at 84). On that occasion, her mother was taking a shower in a bathroom off of the main hallway. The victim went into her mother's bedroom to retrieve nail polish. Smith was sitting on a "couch bed" in the bedroom watching television. (*Id.* at 85-87). According to the victim, he told her to "come here" and proceeded to pull down her pajama bottoms and underwear. (*Id.* at 88-89). He then pulled down his own shorts, placed her on her back, and inserted his penis into her vagina. (*Id.* at 89-93). She described his penis or "private

part" as "hairy" near his body and "nasty" looking. (*Id*. at 91). The victim testified that Smith moved "up and down" while having sex with her and that the experience was painful. (*Id*. at 93-94). She explained that he was on top of her but did not put his full weight on her. Instead, he held himself up somewhat and had his arms by her sides. (*Id*. at 94-95). The victim stated that Smith stopped having sex with her when her mother turned off the bathroom light. Her additional testimony suggested, however, that what happened first was she heard her mother turn off the shower water. (*Id*. at 95). At that point, Smith pulled up his shorts and told her to pull up her clothes. (*Id*. at 95). The victim had to clean "white stuff" off of her thighs after the incident. (*Id*. at 99). She identified it as having come from Smith's "private part." (*Id*.).

{¶ 11} The victim testified that the second incident of rape occurred at her house, "Residence 2." On that occasion, Smith was babysitting her while her mother worked. (*Id*. at 106). The victim recalled watching a Sponge Bob cartoon in the living room before turning off the television, going to her own bedroom, and closing the door. (*Id*. at 107). She testified that Smith came into her bedroom and pulled down her pants and underwear. (*Id*. at 108-109). He proceeded to pull down his own shorts, "lean [her] over" on her back, and place his penis inside her vagina. (*Id*. at 110). He moved "up and down," and his penis "came in and out" of her "private part." (*Id*. at 111). The victim found the experience painful. (*Id*.). Smith stopped after the victim saw "white stuff" come out of his "private part." (*Id.* at 112). Apparently on the same occasion, Smith also engaged in an act of importuning by asking the victim to put her "mouth on his penis." (*Id*. at 134). The victim testified that she refused, and he left the room. (*Id*.).

{¶ 12} The victim testified that the third incident of rape occurred at her apartment, "Residence 3." Once again, Smith was babysitting her while her mother was out of the house.

The victim recalled being in Smith's bedroom with him. (*Id*. at 119). She was wearing her school uniform, and he was wearing shorts and a t-shirt. (*Id*. at 119-120). Smith proceeded to remove the bottom part of her uniform and his own shorts. (*Id*. at 120-121). He then placed her on her back, got on top of her, and inserted his penis into her vagina. (*Id*. at 121-122). He was "moving up and down" with his "private part" going "in and out." (*Id*. at 122). As before, the victim found the experience painful and saw "white stuff" on her thigh and near her vagina. (*Id*. at 121-123). The victim initially stated that the incident stopped when she heard her mother coming in the door. She then clarified that what prompted Smith to stop may have been her mother's car pulling up outside. (*Id*. at 122).

{¶ 13}  The victim described a final incident where Smith tried to remove her clothes. On that occasion, she resisted by retreating to her bedroom. (*Id*. at 125). He did not follow her and never tried anything like that again. (*Id*. at 126). The victim explained that she initially did not disclose any of Smith's acts of sexual abuse because he told her not to tell and she was afraid. (*Id*. at 97-98, 112-114, 123-124). The victim acknowledged that her mother had inquired on other occasions whether anyone ever had touched her inappropriately. (*Id*. at 127). The victim admitted previously lying and saying no. (*Id*. at 128). She eventually told her mother the truth when her mother asked her to swear on her great-grandmother's grave that nobody had touched her. (*Id*. at 129-131). The victim explained that she told the truth then because "it's not good to lie on somebody's grave." (*Id*. at 131). The victim and her mother both described the victim as crying when she disclosed what Smith had done. (*Id*. at 42, 131). The victim's mother further testified that she had been suspicious of something before her daughter's revelation. Specifically, she had noticed that her daughter had "started going to her room and closing the door behind her every

time" Smith was around. (*Id*. at 44).

{¶ 14} Although the victim's testimony undoubtedly was legally sufficient to support Smith's convictions (a conclusion he does not challenge), he argues that the convictions are against the weight of the evidence because her testimony lacked credibility. As noted above, he claims her testimony was formulaic, lacked detail, contained inconsistencies, and at times was incredible. Therefore, he argues that the jury clearly lost its way in believing the victim. We do not agree.

{¶ 15} While the sequence of events was similar in each instance, the victim provided fairly detailed testimony about what happened on each occasion, including how and where each act occurred, what she and Smith were wearing, how they were positioned, what they did, how each act ended, and what she did afterward. We are unconvinced that the victim's testimony was so formulaic as to render it inherently suspicious or unworthy of belief.

{¶ 16} Smith also suggests that the victim's responses were "taught" to her by someone because she used the word "rape" to describe one of the incidents. He reasons that "rape" is not a word one would expect a girl her age to utter. But he also correctly acknowledges that she passively may have picked up or overheard the word during the investigation into her allegations.

{¶ 17} We do agree with Smith, however, the victim's version of events raised some apparent or potential inconsistencies. For example, her testimony on direct examination suggested that Smith had ejaculated on each of the three occasions at issue and that on two of those occasions he had stopped upon hearing the victim's mother—once turning off the shower water and once pulling into the driveway. On direct examination, the victim did not mention Smith stopping any of the sex acts at her request. On cross examination, however, she was asked

whether she ever had told Smith to stop. She responded affirmatively and stated that Smith had stopped at her request. (Tr. at 163-164). The victim also testified that the three acts of sexual intercourse she described at trial were the only three times Smith ever had touched her inappropriately. (*Id*. at 168-169). Caseworker Jamie Fricke testified, however, that the victim had told her about two or three incidents of sexual intercourse with Smith at one residence and three or four more such incidents at another residence. (*Id.* at 262).

{¶ 18}  Finally, Smith contends the victim's claim about having sex with him while her mother was in the shower was simply incredible. He argues that the bathroom at issue was relatively close to the bedroom where the sexual assault allegedly was occurring. He reasons that if the victim's mother's act of turning off either the water or the bathroom light caused him to discontinue the rape, the victim's mother almost certainly would have seen something when she exited the bathroom. Similarly, he reasons that if the third incident stopped when the victim's mother either pulled her car in the driveway or started to open the front door, it is nearly impossible to believe that she would not have seen something—the sex act itself, pants being pulled up, or the clean up. Therefore, he asserts that the victim's testimony about these alleged incidents defies belief.

{¶ 19}  Although the record does contain some uncertainty or conflict about (1)  whether the victim asked Smith to stop the sexual assaults and (2) how many times those assaults occurred at each location, these were issues for the jury to consider in assessing the victim's credibility. We are unconvinced that any such discrepancies were so substantial as to make it patently apparent that the jury lost its way in believing the victim. This remains true even taking into account Smith's additional argument that the victim provided incredible testimony about

being sexually assaulted while her mother was nearby in the shower and while her mother pulled a car into the driveway. Despite Smith's arguments, we do not agree that it would have been nearly impossible for him to rape the victim under such circumstances without being detected.

{¶ 20}   With regard to the shower incident, the jury reasonably could have concluded that the sexual activity stopped when the victim's mother turned off the water. The record does not reflect how long the victim's mother remained in the bathroom after turning off the water. Therefore, Smith and the victim may have had time to stop what they were doing, put their clothes back on, and clean up without being detected. While the actions the victim ascribed to Smith on that occasion certainly qualify as reckless, they do not defy belief. We reach the same conclusion regarding the incident where the victim's mother returned home. The jury reasonably could have concluded that the sexual activity stopped when she pulled into the driveway. The record does not reflect how long it took her to enter the house or to encounter Smith and the victim once inside. Here too Smith and the victim may have had time to stop what they were doing before being seen.

{¶ 21}   In short, the victim gave a fairly detailed account of being raped by Smith on three occasions and of him once seeking oral sex. She also gave a reasonable explanation why she initially failed to disclose the incidents but then decided to reveal them after being asked to swear on her great-grandmother's grave. The victim's mother testified that the victim was crying when she made the disclosure. In addition, the victim's mother testified that, prior to the disclosure, the victim had started avoiding Smith by going to her room and closing her door. We note too that the record reveals little if any motive for the victim to fabricate sexual-abuse allegations against Smith. Although he described some animosity with the victim's mother's

family, Smith admitted being happy with the victim and her mother. (Tr. at 317-318). He acknowledged not having any real problems with the victim, who he had helped raise and had treated as his daughter. (*Id*. at 317-319).

{¶ 22}   After considering all of the evidence, and notwithstanding the inconsistencies and other issues raised by Smith, we do not believe that the jury clearly lost its way in crediting the victim's testimony and finding him guilty of three counts of rape and one count of importuning. His convictions are not against the manifest weight of the evidence.

{¶ 23}   The assignment of error is overruled, and the trial court's judgment is affirmed.

. . . . . . . . . . . . .

FROELICH, P.J., and FAIN, J., concur.

Copies mailed to:

Mathias H. Heck
Kirsten A. Brandt
Christopher W. Thompson
Hon. Michael Tucker